**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF RHODE ISLAND**

---

| | |
|---|---|
| In re: Antonio G. Portunato, III,<br>Debtor | BK No. 17-11614<br>Chapter 7 |

---

William K. Harrington,
United States Trustee
for Region One,
    Plaintiff,

v.                                                                                             A.P. No. 18-01063

Antonio G. Portunato, III,
    Defendant.

---

## **DECISION AND ORDER**

       William Harrington, United States Trustee for Region One ("UST"), commenced this adversary proceeding seeking to deny Debtor Antonio G. Portunato, III a discharge under Bankruptcy Code §§ 727(a)(2) and (4).[1] The UST alleges that while under oath Mr. Portunato knowingly and fraudulently failed to disclose his interest in a 2007 Peterbilt 357 truck ("Peterbilt 357"), and after the petition date concealed the vehicle from the chapter 7 case trustee and the lien holder with the intent to hinder, delay, or defraud them. Additionally, the UST alleges that post-petition Mr. Portunato transferred, removed, or concealed other equipment and vehicles he owned with the same intent. Mr. Portunato denies the allegations and counters that he listed on his schedules the only Peterbilt truck he owns — the very same truck the UST alleges he failed to disclose — and did not intend to defraud anyone when he caused the other equipment and vehicles to be sold at auction.

---

[1] Unless otherwise indicated, the terms "Bankruptcy Code," "chapter," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. Reference to the "Bankruptcy Rules" or "Rule" shall mean the Federal Rules of Bankruptcy Procedure.

The Court held a day and a half trial during which the UST presented his case through two witnesses, chapter 7 trustee Stacy Ferrara ("Trustee") and Larry Spellman, principal of North Country Auctions, LLC ("North Country"), and admitted into evidence numerous exhibits. Mr. Portunato cross-examined the UST's witnesses and submitted a few of his own exhibits. At the conclusion of the UST's presentation of his case, Mr. Portunato declined to present any other witnesses or submit additional exhibits. At closing argument, Mr. Portunato maintained that the UST failed to meet his burden to prove all of the requisite elements under the statutory provisions and, therefore, that he is entitled to a discharge of all of his debts.

This decision constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052. After careful consideration of the relevant filings, the testimony, the exhibits admitted into evidence, and the arguments of the parties, the Court concludes that the UST has proven grounds upon which Mr. Portunato must be denied a discharge of his debts under § 727(a)(2). More precisely, as to Counts I and II of the complaint, the UST did not meet his burden of proof to demonstrate that Mr. Portunato failed to disclose his interest in the 2007 Peterbilt 357 truck or that he concealed the vehicle. There is insufficient evidence to conclude that Mr. Portunato owned two Peterbilt trucks. The Court finds that, at all relevant times, the one and only Peterbilt truck owned by Mr. Portunato was the one identified and disclosed on his schedules. However, as to the balance of the allegations set forth in Count II and the allegations in Count III of the complaint, the Court concludes that Mr. Portunato did in fact conceal, transfer, and remove property of the estate after the petition date with the actual intent to hinder, delay, or defraud his creditors and the Trustee. Accordingly, the UST has met his burden of proof as to the allegations in Count II pertaining to other estate property and as to the allegations in Count III.

I.     **Jurisdiction**

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(a) and (b) and 1334 and Rule 109(a) of the local rules of the United States District Court for the District of Rhode Island. This is a core proceeding under § 157(b)(2)(J).

II.    **Findings of Fact**

The Court makes the following findings of fact based on the parties' stipulated facts in their joint pretrial statement ("JPTS," Doc. #36), the unrebutted testimony of the Trustee and Mr. Spellman, which the Court finds credible, and the UST's exhibits admitted into evidence.

Mr. Portunato filed for relief under chapter 13 on September 18, 2017 (the "Petition Date"). It was not until November 15, 2017, however, that he filed his bankruptcy schedules and Statement of Financial Affairs. Relevant to this matter, he scheduled the following assets, all of which the parties stipulated was property of his bankruptcy estate under § 541(a):

1. 1998 Caterpillar 928G Wheel Loader ("Caterpillar Wheel Loader"), with a scheduled value of $22,000;

2. 1993 Kenworth T800 ("Kenworth T800"), with a scheduled value of $38,000;

3. 1999 Caterpillar 416CIT ("Caterpillar 416 CIT"), with a scheduled value of $20,000;

4. 1993 Volvo L50B Wheel Loader ("Volvo Wheel Loader"), with a scheduled value of $20,000; and

5. 1994 Samsung SL250 Wheel Loader ("Samsung Wheel Loader"), with a scheduled value of $21,000,

(collectively the "Equipment"). (*See* Exh. F; JPTS ¶¶ 13-15). In addition, he scheduled an interest in a 2007 Peterbilt truck with an approximate value of $50,000. His interest in that vehicle also was property of the estate. (JPTS ¶¶ 14-15).

On December 13, 2017, upon motion of Mr. Portunato, his case was converted to chapter 11. During the chapter 11, Dakota Financial, LLC ("Dakota"), as lessor and secured creditor,

sought relief from the automatic stay to enforce its liens against all but one piece of the Equipment because Mr. Portunato had failed to make monthly post-petition lease payments.[2] The Court entered a consent order requiring Mr. Portunato to make all ongoing monthly lease payments and directed that stay relief would be granted to Dakota upon any future default under the terms of its leases. (Exh. H). Subsequently, Mr. Portunato defaulted and Dakota was granted relief from the stay on February 20, 2018, entitling it to enforce its non-bankruptcy law rights against its collateral after March 6, 2018. (*See* Exh. M). On March 6, 2018, however, Mr. Portunato filed a motion to convert his case to chapter 7.

While the conversion motion was pending, Mr. Portunato had several conversations with Mr. Spellman, culminating in a written agreement on March 23, 2018 ("Auction Agreement") for the auction of the Equipment and the Peterbilt 357 the next day by North Country.[3] (*See* Exh. B). At Mr. Portunato's behest, the Auction Agreement was backdated to November 3, 2017, a date Mr. Portunato believed was the approximate date he and Mr. Spellman had preliminary discussions about the potential storage and possible future auction of the Equipment and the Peterbilt 357. The Receipt of Merchandise appended to the Auction Agreement included the Equipment and the Peterbilt 357, as to which Mr. Portunato falsely represented that he had "full authority to sell" and that the assets were "free and clear of any liens [or] encumbrances." (Exh. B). Throughout their dealings, Mr. Portunato did not disclose the pendency of his bankruptcy case. Rather, Mr. Spellman first learned of the bankruptcy case in July 2018, when the Trustee contacted him for an inventory of the assets that Mr. Portunato advised her were stored at North

---

[2] Dakota's lien extended to the Caterpillar Wheel Loader, the Kenworth T800, the Caterpillar 416CIT, the Volvo Wheel Loader and the Peterbilt 357. Another secured creditor, Pawnee Leasing, held a lien against the Samsung Wheel loader. *See* Exh. F, Sch. D.

[3] The parties agree that the auction date referenced in the Auction Agreement is a typographical error; the auction was scheduled for March 24, 2018 and took place on that date. A second auction was held on May 4, 2018 to sell two pieces of the Equipment that were not sold at the first auction. *See* Exh. Q.

4

Country's premises.

Initially, Mr. Portunato was responsible for transporting the Equipment and the Peterbilt 357 to North Country's premises, but it soon became apparent that he lacked the financial wherewithal to do so. Consequently, through Mr. Spellman's trucking company, North Country Trucking and Hauling, LLC, the Equipment was transported from two locations in Connecticut to North Country's Massachusetts location between March 12 and March 23, 2018. The Peterbilt 357, which was at a garage facility for repair of its transmission, was not transported to North Country's location and was not sold at the auctions. (*See* Exh. Q).

Mr. Portunato admits that he entered into the Auction Agreement and authorized North Country to sell the Equipment without notifying the Court, the chapter 13 trustee, the UST, the Trustee, or Dakota and without obtaining approval of the Court or Dakota. (JPTS ¶¶ 23-25). At the March 24 auction, the Caterpillar 416 CIT and the Kenworth T800 were sold for the aggregate sum of $26,250. (JPTS ¶ 27). The Volvo Wheel Loader was sold at a second auction held on May 4, 2018 for $18,500. (JPTS ¶ 28).[4]

On March 26, 2018, the Court granted Mr. Portunato's motion and the case was converted to chapter 7. The following day, Dakota's counsel contacted the Trustee to recover its collateral consisting of nearly all of the Equipment. The Trustee informed counsel that she had not yet conducted the § 341 meeting of creditors and could not determine whether the bankruptcy estate had an interest in the collateral. Having already been granted stay relief, Dakota then filed a motion to compel Mr. Portunato to turn over the Equipment, averring that its efforts since early March to obtain possession of the collateral proved unavailing and its location had not been disclosed. (Exh. O). Because of Mr. Portunato's fraudulent conduct, at the time the

---

[4] Prior to the second auction, the Samsung Wheel Loader was repossessed by Pawnee Leasing. (JPTS ¶ 30).

5

motion was filed neither Dakota, the Trustee, nor the Court knew that several pieces of Dakota's collateral already had been sold. (JPTS ¶ 27).

Turning now to the initial § 341 meeting held on April 26, 2018, Mr. Portunato's testimony at that meeting contradicted the information in his schedules. He maintained that he did not actually own several of the pieces of equipment and vehicles he had listed because he had sold or transferred them to business entities he controlled prior to the Petition Date. As characterized by the Trustee, Mr. Portunato's testimony was evasive. Frustrated with his responses, the Trustee continued the meeting and requested that Mr. Portunato file amended schedules consistent with his testimony and produce documentation to substantiate his disavowal of ownership. Mr. Portunato did not produce any such documentation. In fact, in his amended schedules filed before the next continued § 341 meeting, Mr. Portunato again listed the Equipment and the Peterbilt 357 as assets he owned. He did not disclose that some of the Equipment already had been sold or list the sale proceeds on his amended schedules.

Notably, between April 26, 2018 and July 30, 2018, the Trustee held several continued § 341 meetings in an effort to ascertain the whereabouts of the Equipment, the Peterbilt 357, and other listed assets. (*See* JPTS ¶ 12). Mr. Portunato actively thwarted the Trustee's efforts. He falsely and intentionally represented to the Trustee at the initial § 341 meeting that the Equipment and the Peterbilt 357 were stored at locations in Connecticut and North Country's Massachusetts premises when he knew that some of the Equipment had been sold at the March 24 auction. Further, he intentionally concealed the sale, the sale proceeds, and that a second auction was scheduled for May 4, 2018 from the Trustee and Dakota. (*See* JPTS ¶ 24). Thus, the second auction proceeded as scheduled and the Caterpillar Wheel Loader was sold without Court order, notice, or approval and without disclosure to the Trustee or Dakota. (*See* JPTS ¶ 29).

Because Mr. Portunato failed to provide an inventory of his equipment and vehicles by location as requested, the Trustee and Mr. Portunato's counsel visited the two Connecticut storage locations at the end of June 2018. The Trustee concluded that the items located there were of inconsequential value and discovered that neither the Peterbilt 357 nor the Equipment was there. It was not until the Trustee contacted North Country in July 2018 that she learned from Mr. Spellman that some of the Equipment had been sold at the two auctions months earlier. Following the Trustee's call, North Country provided a written accounting of the two auction sales. (Exh. Q).

The accounting revealed that North Country still retained the sale proceeds, contrary to its usual procedures. Mr. Spellman explained that his customary practice was to pay off any liens against the items sold at auction and then disburse any excess funds to the consignor shortly after the conclusion of the sale. That did not occur here because Mr. Portunato would not authorize the release of the proceeds, insisting instead that he would deal directly with the lien holders so he could resolve issues relating to the "cross collateralization" of the Equipment. Ultimately, the sale proceeds were disbursed to Dakota on account of its liens against the Equipment, but not until October 2018.

### III.    The UST's Complaint

The UST filed a three count complaint under § 727(a) to bar Mr. Portunato from obtaining a discharge of his debts. Count I alleges that Mr. Portunato should be denied a discharge under § 727(a)(4) because he knowingly and fraudulently made a false oath or account on his schedules by failing to disclose his interest in a Peterbilt truck that was listed on the Auction Agreement. As noted, the UST's allegations are predicated on his belief that Mr. Portunato owned two Peterbilt trucks and failed to disclose one of them on his schedules. In

Count II the UST moves under § 727(a)(2)(A) and (B), alleging that Mr. Portunato knowingly concealed his interest in a second Peterbilt truck and also his interest in the Equipment by delivering the Equipment to North Country to be held pending an auction sale. His concealment, the UST alleges, was done with the intent to hinder, delay, or defraud his creditors and the Trustee. Finally, in Count III, the UST also invokes § 727(a)(2)(B), alleging that Mr. Portunato transferred and removed the Equipment after the Petition Date with the intent to hinder, delay, or defraud his creditors and the Trustee.[5]

## IV. Applicable Law

### i. Section 727(a) Generally

This statute provides an exhaustive list of grounds to deny a debtor a discharge. *See* 6 Collier on Bankruptcy ¶ 727.01 (16th 2020). A party objecting to a debtor's discharge under this provision must prove each requisite element by a preponderance of the evidence. Fed. R. Bankr. P. 4005; *see also Groman v. Watman (In re Watman)*, 301 F.3d 3, 7 (1st Cir. 2002). The burden that must be satisfied by a party objecting to discharge is fairly high; "exceptions to discharge are narrowly construed" to promote the fresh start policy, one of the fundamental principles of the Bankruptcy Code. *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 66 (1st Cir. 2004) (citing *Palmacci v. Umpierrez (In re Umpierrez)*, 121 F.3d 781, 786 (1st Cir. 1997)). That being said, the very purpose of § 727(a) is to ensure that debtors "do not play fast and loose with their assets or with the reality of their affairs." *Id*. To this end, the moving party must establish "real and substantial" grounds for denial of a discharge. *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citation omitted). "[T]he successful functioning of the bankruptcy act hinges

---

[5] In all three counts of the Complaint the UST also alleged that Mr. Portunato knowingly and fraudulently failed to disclose his interest in an East End Trailer and concealed the same with the intent to hinder, delay, or defraud his creditors and the Trustee. Upon further discovery, the UST determined he would not pursue the allegations about this particular piece of equipment. (Pl.'s Mem., Doc. #57 p. 12).

both upon the [debtor's] veracity and his willingness to make a full disclosure. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *Id.* (citations and internal quotation marks omitted). The task for the Court when deciding a case under § 727(a) is to strike a balance between these goals of the Code.

      ii.    <u>Section 727(a)(4) – False Oaths or Accounts</u>

Section 727(a)(4) bars a discharge if "the debtor knowingly and fraudulently, in or in connection with the case— (A) made a false oath or account." The statute requires the Court to determine whether (1) the debtor made an oath (2) that was false, (3) that was related to a material fact in the case, (4) and that was made knowingly and (5) fraudulently. *Dwyer v. Frumm (In re Drumm)*, 524 B.R. 329, 394 (Bankr. D. Mass. 2015). The burden of proof rests with the party objecting to the discharge, but "once it reasonably appears that the oath is false, the burden falls upon the [debtor] to come forward with evidence that he has not committed the offense charged." *In re Tully*, 818 F.2d at 110 (citing *Matter of Mascolo*, 505 F.2d 274, 276 (1st Cir. 1974)).

"The existence of false or inaccurate statements is not, in and of itself, sufficient cause to deny a debtor's discharge. . . ." *Premier Capital, Inc. v. Diamond (In re Diamond)*, 106 Fed.Appx. 73, 78 (1st Cir. 2004) (citations and internal quotation marks omitted). It is up to the objector to demonstrate that the debtor knew the truth and "nonetheless willfully and intentionally [swore] to what [was] false." *Hannon v. ABCD Holdings, LLC (In re Hannon)*, 839 F.3d 63, 72 (1st Cir. 2016) (citation and internal quotation marks omitted). Courts will generally disregard "ignorant or inadvertent omission[s] as evidence of fraudulent intent," but may find that the "cumulative effect of a series of innocent mistakes" equates to fraud or a reckless

disregard for the truth. *Robin Singh Educational Serv., Inc. v. McCarthy (In re McCarthy)*, 488 B.R. 814, 826 (1st Cir. BAP 2013). Accordingly, fraudulent intent can be established by circumstantial evidence or course of conduct. *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir. 1994); *In re McCarthy*, 488 B.R. at 826.

A false oath must be about a *material* fact that relates to the debtor's estate or is relevant to "the discovery of assets, business dealings, or the existence and disposition of property." *Lussier v. Sullivan (In re Sullivan)*, 455 B.R. 829, 839 (1st Cir. BAP 2011) (citation and internal quotation marks omitted). "[T]he threshold to materiality is fairly low." *Id*. "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless" or are not property of the bankruptcy estate. *Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992). Hence, a debtor cannot escape the reach of § 727(a)(4) by asserting that the property omitted or about which a false oath was made is of inconsequential value. *In re McCarthy*, 488 B.R. at 828.

    iii.    <u>Section 724(a)(2) – Transfer, Removal or Concealment of Assets</u>

As relevant here, § 727(a)(2) denies the debtor a discharge if within one year prior to the bankruptcy filing, or after the filing, a debtor "transferred, removed, … or concealed" property of the estate "with intent to hinder, delay, or defraud a creditor or an officer of the estate." To prevail the objecting party must prove that (1) the property was part of the bankruptcy estate, and (2) the debtor transferred, removed, or concealed the property (3) with the intent to hinder, delay, or defraud a creditor or officer of the estate. *In re Schifano*, 378 F.3d at 66.

Regarding the second element, Bankruptcy Code § 101(54)(D) defines "transfer" as any mode "of disposing of or parting with … property" or "an interest in property." Under this definition, "any transfer of an interest in property is a transfer, including a transfer of possession,

Case 1:18-ap-01063 Doc 58 Filed 09/17/20 Entered 09/17/20 15:48:17 Desc Main
Document Page 11 of 18

custody, or control even if there is no transfer of title." *In re Watman*, 301 F.3d at 10 (citing S. Rep. No. 95-989, at 27 (1978)). "Concealment" is not defined in the Code, but courts have construed it to mean more than mere physical hiding of property; the term encompasses conduct such as "placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusal to divulge … information" known by the debtor. 6 Collier on Bankruptcy ¶ 727.02[6][b] (16th ed. 2020); *see also Antognoni v. Basso (In re Basso)*, 397 B.R. 556, 564 (1st Cir. BAP 2008) ("'Concealment' refers to the withholding of something which one knows and which one is duty bound to reveal."); *Rhode Island Depositors Economic Protection Corp. v. Hayes (In re Hayes)*, 229 B.R. 253, 259 (1st Cir. BAP 1999) (explaining that concealment includes transferring title coupled with retention of the benefits of ownership); *CIB Marine Capital, LLC v. Herman (In re Herman)*, 495 B.R. 555, 594 (Bankr. S.D. Fla. 2013) ("Omissions in bankruptcy schedules and statements of financial affairs constitute concealment where the omission is fraudulent and material.").

The last prong of § 727(a)(2) requires the party seeking the denial of a discharge to establish that the debtor acted with "actual intent" to hinder *or* delay *or* defraud his creditors. *Marrama v. Citizens Bank (In re Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006); *In re Drumm*, 524 B.R. at 404. Actual intent, however, need not be proven by direct evidence. Cognizant that debtors rarely provide such direct evidence, the First Circuit instructs that actual intent can be established by circumstantial evidence. *In re Marrama*, 445 F.3d at 522. Consequently, when assessing actual intent, courts frequently draw inferences about the debtor's conduct and intent from the totality of the circumstances. *Warchol v. Barry (In re Barry)*, 451 B.R. 654, 659 (1st Cir. BAP 2011). Some of the "badges of fraud" considered by courts when analyzing actual intent are:

> (1) insider relationships between the parties; (2) the retention of possession, benefit or use of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4) the financial condition of the party sought to be charged both before and after the transaction at issue; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; and (7) an attempt by the debtor to keep the transfer a secret.

*In re Watman*, 301 F.3d at 8.

Not all the "badges" need be proven, but "[t]he concurrence of several tell-tale 'badges of fraud' will support a finding that the debtor acted with the necessary fraudulent intent." *Van Kampen Merrit, Inc. v. Sterman (In re Sterman)*, 244 B.R. 499, 504 (D. Mass. 1999). Actual intent also can be inferred from the "existence of 'badges of fraud,' for which no adequate rebuttal or explanation is evident." *Id*. As a practical matter, the movant may prevail where the totality of the circumstances show a "real and substantial" reason for denying discharge. *In re Tully*, 818 F.2d at 110.

### V. Analysis

#### i. Application of § 724(a)(4) – Count I

Bankruptcy Rule 1008 states that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration." It is axiomatic that the information Mr. Portunato provided on his schedules and statements of financial affairs is the equivalent of a verification under oath. *See Perry v. Warner (In re Warner)*, 247 B.R. 24, 26 (1st Cir. BAP 2000) (citing 28 U.S.C. § 1746). The UST maintains that Mr. Portunato owned an additional Peterbilt truck as of the Petition Date and that his failure to schedule it constitutes a false oath sanctionable under § 724(a)(4) by denial of a discharge. To support his contention, the UST focuses on the differences between Mr. Portunato's description of a Peterbilt truck on his schedules and the description on the Receipt of Merchandise appended to the Auction

Agreement. This discrepancy, the UST concludes, proves that Mr. Portunato has an interest in two Peterbilt trucks and his omission of one of the trucks on his schedules was an intentional false oath. *See Jenzack Partners, LLC v. Gillis (In re Gillis)*, 612 B.R. 1, 12 (Bankr. D. Mass. 2019) ("False oaths can include affirmative misrepresentations as well as omissions of assets, income, and transfers.").

The Court cannot adopt the UST's conclusion. The descriptions of the Peterbilt truck at issue are both somewhat vague, lacking in detail such as a complete description of the actual vehicle model or vehicle identification number. Mr. Portunato listed a "2007 Peterbuilt [sic] 6x4 Alum Cab" on Schedule A/B: Property. (Exh. F, P). The description in the Receipt of Merchandise lists a "2007 Pete 357." (Exh. B). The UST's evidence submitted at trial is limited to this discrepancy in the descriptions of a Peterbilt truck and the testimony of the Trustee that the schedules list a number of vehicles of the same make and year, but different models.

From these slim facts, the UST takes the leap that Mr. Portunato must have had an interest in two different Peterbilt trucks as of the Petition Date. The evidence adduced at trial simply does not justify the UST's conclusion, and the Court will not take that leap. In his post-trial memorandum (Doc. #56), Mr. Portunato vigorously disputes the existence of a "second" Peterbilt truck in which he holds any interest. He emphasizes that the descriptions are only *slightly* different and both reference a "2007 Peterbilt." Indeed, Mr. Spellman's testimony undermines the UST's two-Peterbilt-trucks theory. He explained that when he and Mr. Portunato viewed the Equipment and the vehicles in Connecticut to be auctioned, he observed only one Peterbilt truck (located at a repair shop), that all Peterbilt trucks have aluminum cabs, and that a reference to the truck as an "aluminum cab" Peterbilt is not unusual. In short, the UST has not carried his burden of proof to deny Mr. Portunato a discharge under § 727(a)(4) based on the

allegations in Count I of the Complaint.

    ii.    <u>Application of § 727(a)(2) – Counts II and III</u>

For the same reasons as in Count I, the UST's proof of his allegations in Count II about the Peterbilt 357 are deficient and he has failed to carry his burden under § 727(a)(2) to deny Mr. Portunato his discharge based on those allegations. The same is not true, however, as to the allegations in these counts about the Equipment. Here, the Court finds that the UST has satisfied his burden of proof to deny Mr. Portunato his discharge because of his conduct relating to the Equipment.

Considering the totality of the circumstances and the timing of events, the UST has demonstrated sufficient "badges of fraud" in Mr. Portunato's transfer of the Equipment and concealment of the sale proceeds. It is clear to the Court that Mr. Portunato's conduct falls well within the parameters of § 727(a)(2)(B) to bar his discharge. *See, e.g., Cox v. Villani (In re Villani)*, 478 B.R. 51, 60 (1st Cir. BAP 2012) (looking at the chronology and weighing all of the debtor's transfers and concealments to find intent). Mr. Portunato knowingly and intentionally concealed the transfer of the Equipment and the sale proceeds from the Trustee and Dakota with the intent to hinder and delay the Trustee's investigation of the Equipment and Dakota's rights to take possession and control of the Equipment on account of its secured claim. After Dakota had been granted stay relief to enforce its liens against the Equipment, Mr. Portunato entered into the Auction Agreement, made arrangements for the transfer of the Equipment to North Country's business premises, and authorized its sale by auction. He did so without notice to or permission of the Court, the Trustee, or Dakota. And he misrepresented to North Country that he was the "legal owner of the [Equipment] [or] the owner's designated agent with full authority to sell the property, which was free and clear of any liens of encumbrances." (Exh. B, Receipt of

Merchandise). But Mr. Portunato's misconduct did not stop there. He manipulated Mr. Spellman into backdating the Auction Agreement to November 3, 2017. Why he thought this would enable him to escape the consequences of his fraud eludes the Court. On the backdated date, Mr. Portunato's bankruptcy case was pending under chapter 13 and his actions were no more authorized than in March 2018, while in a chapter 11, when he actually entered into the Auction Agreement.

Even after the case was converted to chapter 7 and Dakota filed a motion to compel turnover of its collateral, including some of the Equipment, Mr. Portunato continued such concealment. At the initial § 341 meeting, Mr. Portunato knowingly and with intent to defraud the Trustee and Dakota concealed the auction and sale proceeds and misrepresented under oath that the Equipment was still stored in locations in Connecticut and Massachusetts. *See Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254-56 (1st Cir. 1991) (actual fraudulent intent can be inferred from a substantial transfer of the debtor's property). He also hindered the prompt turnover of the sale proceeds to the Trustee or Dakota by not only failing to disclose them, but by refusing to authorize Mr. Spellman to deliver them to Dakota so he could try to resolve "cross collateralization" issues with the lien holder.

Mr. Portunato proffers as a defense that he did not intend to hinder, delay, or defraud the Trustee, Dakota, or any other creditors. First, he argues that at the time of the March 2018 auction he was a debtor-in-possession under chapter 11 and was "making the necessary arrangements to get his affairs in order in anticipation of proceeding with" a chapter 7 liquidation. (Def.'s Mem. #56 p. 8). His argument misses the mark entirely. It is precisely the duty of a chapter 7 trustee to undertake the orderly liquidation of a debtor's non-exempt assets, not the debtor. Moreover, under § 363(c)(1), a debtor-in-possession may only sell property of the

15

estate "in the ordinary course of business" without notice and approval of the Court. The burden of demonstrating that the Auction Agreement and the sale were in the ordinary course of business falls on Mr. Portunato. *See Braunstein v. McCabe*, 571 F.3d 108, 124 (1st Cir. 2009). He has provided no evidence whatsoever to support his "ordinary course" contention, nor does he elucidate how the liquidation of the Equipment, a substantial portion of his assets, was in the ordinary course. His business, as listed on his Petition, was "Northeast Snow Plowing," of which he was the sole proprietor.[6] The argument also ignores the obligation of a chapter 11 debtor to keep the Court and creditors informed about the business operations and assets. *See Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985). The Court finds that Mr. Portunato's conduct and the sale of the Equipment was not "in the ordinary course of business."

Second, Mr. Portunato asserts "no harm, no foul" because there was no lack of consideration for the transfers and neither the UST nor Dakota have asserted otherwise. He further highlights that he did not personally profit from the transfers and sale of the Equipment and that the sale proceeds were ultimately paid to Dakota. This argument is disingenuous. Mr. Portunato does not challenge Dakota's liens against the Equipment or its entitlement to the sale proceeds. Without doubt, and the Court so finds, his deceitful conduct hindered the Trustee and Dakota from taking possession of the Equipment, controlling its liquidation, and recovering the sale proceeds in a prompt manner. Although it is not entirely clear from the record what actual benefit Mr. Portunato might have obtained from his concealment, transfer, and sale of the Equipment, it is quite evident he believed that by doing so he would obtain a personal benefit. As

---

[6] The Court may take judicial notice of its docket. *See* Fed. R. Evid. 201; *Freshman v. Atkins*, 269 U.S. 121, 124 (1925) (court may take judicial notice of and give effect to its own records in another, but interrelated, proceeding); *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 n.2 (10th Cir. 1990) (bankruptcy court properly took judicial notice of contents of debtor's statement of affairs and schedules).

discussed above, Mr. Spellman's standard practice of remitting the sale proceeds to the lien holders shortly after the auction was not followed in this situation. He testified that he agreed to such a deviation at Mr. Portunato's insistence that it was necessary in order to settle alleged cross collateralization of liens against the Equipment.

Trying to diffuse the "badges of fraud" demonstrated by the UST, at closing argument, Mr. Portunato's counsel asked the Court to take judicial notice of the chapter 7 bankruptcy case of one of his corporate businesses as evidence that Mr. Portunato gained no benefit from his actions. With the issue raised, the Court reviewed the schedules and Statement of Financial Affairs. (Exhs. F, P). These reveal that he owned or held interests in three separate businesses, one of which was the snow plowing business of which he is the sole proprietor.[7] Irrespective of the insolvent financial condition of one of his other businesses, what is significant here is that Mr. Portunato refused to permit Mr. Spellman to release the sale proceeds to the rightful lien holder, Dakota, or to the Trustee. He concealed their existence in an effort to obtain a personal gain — the settlement of cross collateralized liens which the Court can only surmise related to at least one of his businesses.

When viewed in their totality, Mr. Portunato's post-petition concealment of the Auction Agreement, the sale of the Equipment, and the sale proceeds, his misrepresentations about the location and storage of the Equipment, and his efforts to hinder the Trustee and/or Dakota from taking possession and control of the Equipment was knowing and undertaken with the intent to hinder, delay, or defraud the Trustee and Dakota. The Court concludes that the UST has provided a real and substantial reason for denying Mr. Portunato a discharge.

---

[7] The schedules and Statement of Financial Affairs reflect his interests in Northeast Snow Plowing; Northeast Landscaping and Tree Service, Inc., a subchapter S corporation; and Northeast Tire Services LLC, of which he is the member. (Exh. F, P and Statement of Financial Affairs, Q., Doc. #27).

## VI. Conclusion

For the foregoing reasons, the Court will enter judgment in favor of Mr. Portunato on Count I, in favor of the UST on Count II as to the allegations relating to the Equipment and on Count III in its entirety, and deny Mr. Portunato a discharge of his debts under § 727(a)(2)(B).

Date:  September 17, 2020                                          By the Court,

*Diane Finkle*
Diane Finkle
U.S. Bankruptcy Judge